## A03A1551. THE STATE v. GOOLSBY.
(586 SE2d 754)

ELDRIDGE, Judge.

The State Court of Stephens County granted Cameron Goolsby's motion to suppress the results of his Intoxilyzer breath test because the arresting officer did not have probable cause to arrest Goolsby for

---

DUI prior to the administration of the test. The State appeals. Finding clear error in the trial court's conclusions, we reverse.

Goolsby did not testify at the motion to suppress. The only evidence adduced therein was from the arresting officer, Corporal Margaret Dawson with the Toccoa Police Department. The evidence of record shows that, at approximately 1:00 a.m. on August 27, 1999, Corporal Dawson observed Goolsby's vehicle traveling east on Currahee Street in Toccoa. Dawson testified at the suppression hearing that Goolsby made an exceptionally wide right-hand turn onto Broad Street. Dawson followed Goolsby; she saw him clearly cross over the double yellow line on Broad Street. It was after this failure to maintain a lane violation that Dawson activated a video camera mounted in her vehicle, which recorded the remainder of the incident. The record before this Court includes the videotape. The trial court found that the videotape and Dawson's testimony regarding the incident "are not significantly inconsistent."

The officer continued to follow Goolsby's truck. The tape shows that, on at least three occasions, Goolsby's truck crossed onto and over the yellow line dividing the road, the most glaring example occurring when Goolsby drove over a set of railroad tracks at a grade crossing. At the hearing on the motion to suppress, the trial court made a specific finding that "when he crossed the railroad tracks up there. To me that was a significant — significant departure from the lane given the fact that the lane's fairly wide."

The videotape shows that, after several failure to maintain a lane violations, Dawson pulled Goolsby over. She immediately noticed that Goolsby "smelled strongly of an alcoholic beverage," and she told Goolsby so. Goolsby told Dawson that he had consumed "one beer." The trial court made a finding that "the officer smelled [alcohol] and the officer knew that the person was drinking."

Corporal Dawson asked Goolsby for his license and insurance card; she testified that he "couldn't complete it as a normal person could, a person not under the influence could." The videotape shows that Goolsby had trouble retrieving his license and insurance, at one point exclaiming, "Dang!" while Dawson encouraged him with the comment, "I know sometimes they're hard to get." The officer then asked Goolsby to exit his truck. The tape shows that Goolsby was unsteady as he exited; after viewing the tape, the trial court specifically found that "when this gentleman got out of the truck, it looked like to me he misstepped once."

Field sobriety tests were conducted; the first was a heel-to-toe walk. The video shows that Goolsby began walking before Dawson could finish instructions on the exercise, and he had to be asked to stop walking until instructions were completed. While the lighting was less than ideal for capturing on videotape the extent of Goolsby's

impairment, a small, unidentified light in the background immediately beside Goolsby's person is revealing in that regard; as he listened to Dawson's instructions, Goolsby's shoulder repeatedly covered and uncovered the light as he swayed back and forth. The tape further shows that, when instructed to place his hands by his sides, Goolsby "clenched" his hands onto his shorts to maintain his balance, so that Dawson had to twice request that Goolsby unclench his hands; she testified "that's usually what people do so then that way they don't use their arms to sway or balance." The videotape also shows that Goolsby had to step out of the heel-to-toe stance before he began to walk. The trial court noted on the record that, during the performance of the heel-to-toe walk, "it looked like he had to steady himself."

Corporal Dawson then had Goolsby perform the one-leg stand. The videotape shows that Goolsby started out on one foot, but he could not maintain the stance, forcing him to switch feet; Dawson testified that such action "is also indicative of, uh, people under the influence[,] when you change your foot out, uh, that gives him an opportunity to reset themselves and not complete the first test." She testified that the video camera's angle did not show the fact that Goolsby "put his foot down both times. On the time that he used his left and his right foot."

Dawson also performed a horizontal gaze nystagmus test on Goolsby; the videotape shows that the officer positioned herself and Goolsby so that the officer's body blocked Goolsby's face and eyes from the police vehicle's flashing lights. Dawson testified that "I don't see any reflection on the individual's face on the tape. And I was there. Usually I block, uh, people with — as far as from the strobe, so it doesn't interfere with their eyes." The officer testified that the nystagmus test showed impairment.

Based upon Goolsby's driving, the odor of alcohol, and his performance on the field sobriety exercises, Dawson determined that Goolsby was an impaired driver. The officer arrested him for failure to maintain a lane and for DUI. After being read the implied consent notice, Goolsby agreed to submit to chemical testing. He blew 0.22 on the Intoxilyzer.

After viewing the videotape and hearing from Corporal Dawson, whose testimony the trial court specifically found "honest," the court expressed concern that Dawson did not have probable cause to arrest Goolsby for DUI at the time implied consent warnings were given and the Intoxilyzer test was administered. The court's main concern appeared to be that, after stopping a person for a traffic violation such as failure to maintain a lane, the reading of implied consent and the results of an Intoxilyzer test could be used to "bootstrap" into probable cause what was originally only an officer's mere hunch or

suspicion that a suspect was driving under the influence. The trial judge noted that, when tired, he drives over the center yellow line and that Goolsby's driving over the centerline was not that severe: "he was barely over the centerline. He didn't endanger anybody . . . just for going over that centerline once or twice and not really getting over in the other lane." The trial judge further opined that Goolsby performed the field sobriety tests adequately because "he stood on one foot a lot longer than I could."

The court then expressed concern that, unless there is probable cause to arrest for DUI, the commission of a simple traffic offense can be used to "harass" a suspect through the reading of implied consent and the administration of a chemical test, after which "[a suspect has] been held up for an hour or so, and things of that nature." The court reasoned that an arrest for DUI should not be based upon the same evidence used to support the stop, i.e., a traffic violation; that independent probable cause to arrest for DUI should exist prior to securing a chemical test. That way, "an intoximeter test should be used to free [a suspect] and not to charge him," since there is already probable cause to arrest and charge for DUI.

Based upon its reasoning, the trial court issued an order on Goolsby's motion to suppress, holding "Probable cause to arrest a defendant for DUI must exist at the time of the arrest." The court held that such probable cause must be "related to the officer's observations of the defendant's driving or . . . related to some facts and circumstances regarding the amount of alcohol consumed." To that end, the trial court found as a matter of fact that Goolsby's failure to maintain a lane did not demonstrate unsafe driving; that Goolsby produced his insurance card and license in a reasonable time; that he was "not unsteady on his feet when exiting the truck or at any time . . . in any sense of the use of the word"; that he "followed clearly all instructions of the officer"; that he "performed the one-legged stand without difficulty"; that he "performed the walk and turn test in an exemplary manner"; and that the police vehicle's flashing lights were in Goolsby's eyes and may have effected the results of the gaze nystagmus test. Accordingly, the court concluded that there was "nothing in the officer's testimony nor in the videotape which establishes defendant committed acts of unsafe driving nor indicated an impaired physical or mental capacity to drive at the time of the stop," and, thus, "there was no probable cause to arrest defendant for driving under the influence of alcohol based on any of the evidence of which the officer had knowledge at the time of the arrest." Consequently, the trial court found that an Intoxilyzer breath test was not warranted, and the court granted Goolsby's motion to suppress the results thereof. *Held*:

Many of the specific factual findings contained in the trial court's

order on the motion to suppress are directly contradicted not only by the videotape and Corporal Dawson's testimony, but by the trial court's own factual findings made during the course of the suppression hearing. However, in order to decide this case, we need not address these inconsistencies concerning the existence of "probable cause" to arrest for DUI in violation of OCGA § 40-6-391, because contrary to the trial court's finding, such arrest is not a prerequisite for giving the implied consent notice and the subsequent administration of a chemical test.

Generally, as it relates to this case, a person who drives a motor vehicle on the highways of this State is deemed to have given consent to a breath test for the purpose of determining the presence of alcohol if he is arrested for *any* offense alleged to have been committed while driving under the influence of alcohol in violation of OCGA § 40-6-391.[1] An officer need only articulate "reasonable grounds" to believe that the person was in violation of OCGA § 40-6-391 during the commission of the offense for which a suspect was arrested.[2]

> [T]he arrest need not be for substance-influenced driving, which would require probable cause as to such offense at the time the officer arrested the person. Instead, if he is under arrest for "any offense" arising out of the acts concerning which the officer has at least "reasonable grounds" to believe that a violation of OCGA § 40-6-391 occurred, he may request the chemical test, even if then short of probable cause to arrest for substance-influenced driving. The obvious purpose of making such a request is to determine whether a violation of 40-6-391 has occurred, so that the person may in addition be charged with it, and to provide proof thereof.[3]

The broad scope of OCGA § 40-5-55 demonstrates the General Assembly's express conclusion that substance-influenced driving "constitutes a direct and immediate threat to the welfare and safety of the general public."[4] And an officer's ability to seek a chemical test based upon "reasonable grounds" to believe an offense might have been committed while in violation of OCGA § 40-6-391 furthers the legislative intention to eradicate the dangers and threats posed by drunk driving.

---

[1] OCGA § 40-5-55 (a).
[2] Id.
[3] *Davis v. State*, 187 Ga. App. 517, 518-519 (1) (370 SE2d 779) (1988); accord *Parsons v. State*, 190 Ga. App. 803-804 (380 SE2d 87) (1989).
[4] OCGA § 40-5-55 (a).

Here, Goolsby was placed under arrest for failure to maintain a lane, as well as DUI. The failure to maintain a lane offense was committed in Corporal Dawson's presence and is corroborated by the videotape; thus, probable cause supports Goolsby's arrest therefor.[5] We reject Goolsby's argument by brief that "there is no evidence that he was placed under arrest for any offense other than DUI." The record contains both the uniform traffic citation issued to Goolsby at the time of the failure to maintain a lane offense and the appearance bond posted by Goolsby for the failure to maintain a lane offense, which was required in order for Goolsby to secure release from jail on such offense.[6]

Based on the totality of the circumstances present in this case, including Goolsby's admission that he had been drinking and the strong smell of alcohol on Goolsby's person, "reasonable grounds" clearly existed for Dawson to believe that the traffic offense for which Goolsby was arrested might have been committed while Goolsby was in violation of OCGA § 40-6-391.[7] Thus, Corporal Dawson's request for a chemical test was proper and the results thereof are admissible, even absent "probable cause to arrest a defendant for DUI at the time of arrest." The trial court's stated legal basis for suppressing the results of Goolsby's Intoxilyzer test was error.

*Judgment reversed. Johnson, P. J., and Mikell, J., concur.*

DECIDED AUGUST 25, 2003 —

*James T. Irvin, Solicitor-General,* for appellant.
*Healy & Svoren, Nina M. Svoren,* for appellee.

---

[5] OCGA § 17-4-20 (a); *Ow v. State*, 255 Ga. App. 98, 102 (564 SE2d 512) (2002) (officer has probable cause to arrest for a traffic violation committed in his presence); accord *Baker v. State*, 202 Ga. App. 73 (413 SE2d 251) (1991); *Brock v. State*, 196 Ga. App. 605, 606 (1) (396 SE2d 785) (1990).

[6] OCGA § 17-6-17; see, e.g., *Chiasson v. State*, 250 Ga. App. 63-64 (549 SE2d 503) (2001) (on traffic offenses, defendant "was released from jail upon posting an appearance bond").

[7] Cf. *State v. Batty*, 259 Ga. App. 431, 432 (577 SE2d 98) (2003) ("the trial court explicitly found [the officer's] credibility to be lacking" as to reasonable grounds to believe defendant was an impaired driver).